## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TAMARA SKUBE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NEIL M. WILLIAMSON, Sheriff of | ) | |
| Sangamon County, Illinois, Solely | ) | |
| In His Official Capacity, TRAVIS | ) | Civil No. 12-3185 |
| KOESTER, In His Individual and | ) | |
| Official Capacities as Deputy of | ) | |
| The Sangamon County Sheriff's | ) | |
| Office, SANGAMON COUNTY, | ) | |
| SANGAMON COUNTY SHERIFF'S | ) | |
| OFFICE, | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

Before the Court are the Motion for Partial Summary

Judgment filed by Defendants Neil Williamson, Travis Koester, and

Sangamon County (d/e 107) and Plaintiff Tamara Skube's Partial

Motion for Summary Judgment (d/e 108).  The Defendants' Motion

is GRANTED as to Skube's false arrest claim against Deputy

Koester in his official capacity and her improper search and seizure claim and DENIED as to her other claims, and Skube's Motion is DENIED.  Additionally, the Court issues notice to the parties under Federal Rule of Civil Procedure 56(f) that the Court is considering granting summary judgment in favor of Skube on her excessive force and false arrest claims against Deputy Koester in his individual capacity.

## I. **BACKGROUND**

On July 21, 2011, Deputy Travis Koester of the Sangamon County Sheriff's Office pulled over a black sports utility vehicle driven by Clifton Flagg in which the Plaintiff, Tamara Skube, was a passenger.  What followed is largely undisputed, as the events were captured by a camera mounted on the dashboard of Deputy Koester's car.  Deputy Koester approached Flagg's window and informed Flagg that he had illegally stopped over two stop lines and had not stayed in his lane while making a left turn.  Video, d/e 1-8 at 2:45-4:25.  Deputy Koester then asked Flagg to step out of his car to perform a field sobriety test.  Vid. at 4:30-4:42.  Flagg eventually complied with Deputy Koester's orders to exit his vehicle,

but he refused to perform the sobriety test. Vid. 4:54-5:52. While Deputy Koester was talking to Flagg about taking the sobriety test, he called in the support of Officer Rachel Leggitt of the Southern View Police Department. Vid. 5:20-5:21. When Flagg refused to perform the sobriety test, Deputy Koester ordered him to turn around and told him that he was under arrest for driving under the influence of alcohol. Vid. 5:53-6:00. As Deputy Koester was placing Flagg under arrest, Skube briefly exited the SUV and walked to the back of the vehicle where Deputy Koester and Flagg were standing. Vid. 6:01-6:06. Deputy Koester ordered her to "get back in the car right now," which she did. Vid. 6:07-6:14. Officer Leggitt arrived a short time later, and Deputy Koester kept his taser drawn and at the ready while Officer Leggitt handcuffed Flagg. Vid. 7:50-8:30. The officers then placed Flagg in the front seat of Deputy Koester's car. Vid. 8:45-10:22.

Deputy Koester next approached the passenger's side of Flagg's SUV and asked Skube to show him her identification. Vid. 10:34-10:37. Skube then threw a cigarette butt out of her car window, and Deputy Koester asked her to step out of the SUV and

pick it up.  Vid. 10:39-10:44.  Skube complied with Deputy Koester's orders by stepping out of the car, showing him her identification, and picking up the cigarette butt.  Vid. 10:48-11:05. She then stepped back into the passenger's side of the SUV.  Vid. 11:11-11:18.  At that point, Deputy Koester informed Skube that she needed to "make some arrangements to get a ride" because the SUV was "being impounded" for a "12-hour DUI hold."  Vid. 11:23-11:37.  Deputy Koester then asked Skube to exit the SUV again and led her back to his squad car, which was parked a short distance behind the SUV.  Vid. 11:42-11:45.  He instructed Skube to wait next to Officer Leggitt, who was standing by Deputy Koester's squad car and keeping an eye on Flagg in the front passenger's seat.  Vid. 11:46-11:52.

Deputy Koester next returned to the passenger's side of the SUV where, according to Skube, he began looking through Skube's purse.  Vid. 11:54-12:07; Skube Deposition, d/e 107-6 at 47. Skube then quickly approached Deputy Koester, exclaiming, "Hey, you have no right."  Vid. 12:08-12:09.  Deputy Koester turned to face her, stating, "Back up now or you're under arrest."  Vid. 12:10-

12:12; Deputy Koester Deposition, d/e 107-1 at 285. Skube continued to object that Deputy Koester did not have the right to search the vehicle, to which Deputy Koester replied, "I'm not searching it, I'm inventorying it. And if you don't do what I tell you right now you're going to be tased." Vid. 12:12-12:15. Skube continued to object, and Deputy Koester told her, "Turn around, you're under arrest." Vid. 12:15-12:17. Skube responded, "How am I under arrest?" and held her arms out to her sides in a questioning gesture, and Deputy Koester again told her, "Turn around and put your hands behind your back." Vid. 12:18-12:22. Skube took a step back and began to repeat that Deputy Koester "had no right," and Deputy Koester repeated his order to "Turn around and put your hands behind your back." Vid. 12:22-12:24.

At that point, Deputy Koester raised his taser and fired it in dart mode into Skube's abdomen. Vid. 12:24-12:25. Skube turned away, screaming, as Deputy Koester approached her while telling her, "Get on the ground." Vid. 12:26-12:28. Skube and Deputy Koester then go off-screen and are no longer visible, but the video includes the audio for the remainder of their interaction. Skube

screamed while Deputy Koester told her, "Roll over and put your hands behind your back or you're getting it again." Vid. 12:31-12:34. Skube began to say "all right," and then Deputy Koester fired the taser again and Skube screamed. Vid. 12:35. Deputy Koester continued to yell at Skube to "Put your hands behind your back," to which Skube screamed, "Okay, goddamn!" Vid. 12:36-12:41. Deputy Koester repeated that order, and Skube yelled out something inaudible. Vid. 12:42-12:46. Skube can then be heard sobbing and saying, "Oh, god." Vid. 12:47-12:52. Skube cried that she "did not do anything," to which Deputy Koester responded, "I gave you several lawful orders and you didn't follow any of them. And then I told you 'turn around and put your hands behind your back,' and you want to fight with us. I'm not doing that, okay?" Vid. 12:55-13:06. Deputy Koester then took Skube into custody. Second Amended Complaint, d/e 69 at ¶ 71.

After this incident, Flagg pled guilty to reckless driving and Skube was not charged with any offenses. Second Amended Complaint, d/e 69 at ¶¶ 57, 78. On July 13, 2012, Skube filed suit against Deputy Koester, Sheriff Neil Williamson, the Sangamon

County Sheriff's Office, Sangamon County, and two of Deputy

Koester's supervising officers.  <u>See</u> Complaint, d/e 1.  She amended

her complaint to its current form on February 28, 2014, bringing

Fourth Amendment violation claims through Section 1983 against

Deputy Koester in his official and individual capacities for excessive

use of force based on the first and second uses of his taser,

improper search and seizure, false arrest, and false imprisonment;

state-law claims against Deputy Koester in his official and

individual capacities for intentional infliction of emotional distress

and assault and battery; a supervisor liability claim against Sheriff

Williamson; and an indemnity claim against Sangamon County.

<u>See</u> Second Amended Complaint, d/e 69 at 15-30.

On September 22, 2014, Skube moved for summary judgment

on her improper search and seizure claim.  <u>See</u> Plaintiff's Partial

Motion for Summary Judgment, d/e 108.  At the same time, the

Defendants moved for summary judgment against Skube's false

arrest and false imprisonment claims, her excessive use of force

claims related to the first use of the taser against Deputy Koester in

both his official and individual capacities, her excessive force claim

related to the second use of the taser against Deputy Koester in his official capacity, the intentional infliction of emotional distress and assault and battery claims, improper search and seizure claims, any claim for compensatory damages arising out of the search, and the supervisor liability claim.  <u>See</u> Defendants' Motion for Partial Summary Judgment, d/e 107.  In response to the Defendants' motion, Skube voluntarily dismissed her claims against Deputy Koester in his official capacity for excessive use of force and improper search and seizure, her false imprisonment claims, her intentional infliction of emotional distress claims, her claim for assault and battery against Deputy Koester in his individual capacity, and her supervisor liability claim.  <u>See</u> Plaintiff's Response to Defendants' Motion for Partial Summary Judgment, d/e 113 at 2. The Court will address the remaining claims below.

## II.  <u>LEGAL STANDARDS</u>

Summary judgment is appropriate where the record, viewed in the light most favorable to the nonmovant, reveals that there are no genuine issues as to any material fact, meaning that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P.

56(a); <u>Trentadue v. Redmon</u>, 619 F.3d 648, 652 (7th Cir. 2010) (noting that all reasonable inferences must be drawn in favor of the nonmovant). The party moving for summary judgment bears the burden of establishing the absence of any genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmovant must present evidence sufficient to create triable issues of fact on each of the essential elements of her claim. <u>Trentadue</u>, 619 F.3d at 652. The court simply determines whether there is a genuine issue of fact for trial without weighing the evidence or evaluating the credibility of the parties and witnesses. <u>Outlaw v. Newkirk</u>, 259 F.3d 833, 837 (7th Cir. 2001).

In addition to moving for summary judgment against most of Skube's claims, Deputy Koester argues that he is entitled to qualified immunity against Skube's Fourth Amendment claims. Governmental actors are entitled to qualified immunity where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982) (providing

that qualified immunity protects governmental actors from liability for civil damages).

The court applies a two-part inquiry to determine whether a defendant is entitled to qualified immunity.  First, the court examines whether the plaintiff has presented evidence, taken in the light most favorable to the plaintiff, that would allow a reasonable fact finder to determine that the plaintiff was deprived of a constitutional right.  Sallenger v. Oakes, 473 F.3d 731, 739 (7th Cir. 2007) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  Second, the court examines whether the particular constitutional right was clearly established at the time of the alleged violation.  Id.  A court may, in its discretion, address the second prong of the test first.  Pearson, 555 U.S. at 242.

The plaintiff bears the burden of establishing the existence of a clearly established constitutional right.  Rice v. Burks, 999 F.2d 1172, 1174 (7th Cir. 1993).  A plaintiff may do this by either pointing to a closely analogous case or showing that the conduct was so egregious that no reasonable officer would have thought he

was acting lawfully.  <u>Chelios v. Heavener</u>, 520 F.3d 678, 691 (7th

Cir. 2008); <u>Abbott v. Sangamon Cnty., Ill.</u>, 705 F.3d 706, 723-24

(7th Cir. 2013).  "Importantly, the right must be clearly established

in a particularized sense, rather than in an abstract or general

sense."  <u>Abbott</u>, 705 F.3d at 731.  However, "a case directly on point

is not required for a right to be clearly established and 'officials can

still be on notice that their conduct violates established law even in

novel factual circumstances.'"  <u>Phillips v. Cmty. Ins. Corp.</u>, 678

F.3d 513, 528 (7th Cir. 2012) (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730,

741 (2002)).

### III. <u>ANALYSIS</u>

The Defendants move for summary judgment on Skube's

excessive force claim against Deputy Koester in his individual

capacity related to the first use of his taser, her improper search

and seizure claim against Deputy Koester in his individual capacity,

her false arrest claims against Deputy Koester in his official and

individual capacities, and her assault and battery claim against

Deputy Koester in his official capacity.[1]  <u>See</u> Defs.' Mot., d/e 107.

---

[1]  This list does not include the claims that the Plaintiff voluntarily dismissed,

Skube moves for summary judgment on her improper search and seizure claim. Pl.'s Mot., d/e 108. The Court finds that summary judgment should be granted against Skube's false arrest claim against Deputy Koester in his official capacity and her improper search and seizure claim and denied against the remainder of her claims. The Court also finds that Skube's motion for summary judgment should be denied. Additionally, the Court issues notice under Federal Rule of Civil Procedure 56(f) that the Court is considering granting summary judgment in favor of Skube on her false arrest and excessive force claims against Deputy Koester in his individual capacity.

### A. Deputy Koester is entitled to summary judgment against Skube's false arrest claim against him in his official capacity.

As an initial matter, Deputy Koester should be granted summary judgment against Skube's false arrest claim against him in his official capacity. "An official capacity suit is the same as a suit against the entity of which the officer is an agent." DeGenova v. Sheriff of DuPage Cnty., 209 F.3d 973, 975 (7th Cir. 2000).

---

as it is not necessary for the Court to discuss the Defendants' arguments against those claims.

Because such a claim is really brought against a defendant's employer, a plaintiff must show that her constitutional rights were violated due to a "policy, custom, or practice" of the employing entity. Waters v. City of Chicago, 580 F.3d 575, 580 (7th Cir. 2009). A plaintiff may make such a showing by establishing "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." Estate of Sims ex rel. Sims v. Cnty. of Bureau, 506 F.3d 509, 515 (7th Cir. 2007).

Skube voluntarily dismissed all of her other claims against Deputy Koester in his official capacity, and she does not present any arguments related to a pattern, practice, or custom within the Sangamon County Sheriff's Office related to false arrests. See Pl.'s Resp., d/e 113 at 10-16. Therefore, the Defendants' motion for summary judgment is granted as to Skube's false arrest claim against Deputy Koester in his official capacity.

## B. Deputy Koester is not entitled to summary judgment or

**qualified immunity against Skube's false arrest claim against him in his individual capacity.**

While Deputy Koester may be entitled to summary judgment against Skube's false arrest claim against him in his official capacity, the same is not true of Skube's false arrest claim against him in his individual capacity. Skube's false arrest claim amounts to an allegation that Deputy Koester violated her Fourth Amendment right to be free from unreasonable seizure by arresting her without probable cause. It follows that if Deputy Koester did have probable cause to arrest Skube, her false arrest claim must fail. See Morfin v. City of E. Chicago, 349 F.3d 989, 997 (7th Cir. 2003); Juriss v. McGowan, 957 F.2d 345, 349 (7th Cir. 1992) ("[A] person arrested with probable cause cannot cry false arrest."). Deputy Koester had probable cause to arrest Skube if "the facts and circumstances within [Deputy Koester's] knowledge and of which [he] ha[d] reasonably trustworthy information [were] sufficient to warrant a prudent person in believing [Skube] ha[d] committed or [was] committing an offense." See United States v. Sawyer, 224 F.3d 675, 678-79 (7th Cir. 2000).

Deputy Koester claims that he had probable cause to arrest Skube for the offense of resisting or obstructing a peace officer. Defs.' Mot., d/e 107 at 9. He further argues that even if he did not have probable cause to arrest her, he is entitled to qualified immunity against Skube's claim because there was not a clear precedent holding that he did not have probable cause. Id. at 14.

Qualified immunity provides officers an added level of discretion in determining whether probable cause existed for an arrest. That is, if a reasonable officer could have believed the arrest was lawful, in light of clearly established law and the information known to the officer, then the officer is entitled to qualified immunity. Abbott, 705 F.3d at 714. This is sometimes called "arguable probable cause," and it protects officers who reasonably but mistakenly believe that probable cause exists. Id. The Court's inquiry will therefore hinge on whether Deputy Koester had "arguable probable cause" to arrest Skube for resisting or obstructing a peace officer.

Illinois law states that "[a] person who knowingly resists or obstructs the performance by one known to the person to be a

peace officer . . . of any authorized act within his or her official capacity commits a Class A misdemeanor."  720 ILCS 5/31-1. Deputy Koester argues that Skube violated the statute by "(1) disregarding his direction to stand by the other office [*sic*] by vacating that position and approaching him; (2) interfering with his inventory of the vehicle following the arrest of the driver; and (3) failing to comply with his repeated orders to back up, turn around, and place her hands behind her back."  Defs.' Mot., d/e 107 at 9-10.  The Court will divide its analysis of Skube's actions and whether they give rise to probable cause into two parts.  First, the Court will examine Skube's actions from the point that she approached Deputy Koester and told him that he did not have the right to search her purse to the time that Deputy Koester declared that she was under arrest, which is the period from 12:08 to 12:17 in the video.  The second part of the Court's analysis will focus on Skube's actions from the point that Deputy Koester stated that Skube was under arrest to when he tased her, or 12:18 to 12:24 in the video.

On the first of these inquiries, the law is clear that Deputy

Koester did not have probable cause to arrest Skube for resisting or obstructing after she walked up to him and objected to his searching her purse. Illinois courts have long held that the resisting statute does not "proscribe mere argument with a policeman about the validity of an arrest or other police action." People v. Raby, 240 N.E.2d 595, 599 (Ill. 1968). Rather, the statute prohibits "only some physical act which imposes an obstacle which may impede, hinder, interrupt, prevent or delay the performance of the officer's duties, such as going limp, forcefully resisting arrest or physically aiding a third party to avoid arrest." Id. This means that a person "may inquire as to [the] reason [for an arrest]; he may point out the officer's mistake; he may protest and argue; but he may not impede the arrest by physical action." People v. Crawford, 505 N.E.2d 394, 396 (Ill. App. Ct. 1987); see also People v. McCoy, 881 N.E.2d 621, 630 (Ill. App. Ct. 2008) ("The statute does not prohibit a person from verbally resisting or arguing with a police officer about the validity of an arrest or other police action.").

Under these rules, Illinois courts have overturned convictions for resisting or obstructing where defendants "simply refused to

comply with the request of an officer," <u>People v. Stoudt</u>, 555 N.E.2d 825, 828 (Ill. App. Ct. 1990), or "merely argued with the officer as to when he would answer the booking questions and then, after an indefinite but certainly a brief time, did answer the questions," <u>People v. Weathington</u>, 411 N.E.2d 862, 863-64 (Ill. 1980).

Furthermore, the Seventh Circuit has held that a group of plaintiffs did not violate the resisting/obstructing statute by approaching police officers "while those officers were attempting to arrest another of the plaintiffs," "asking the officers what was going on," and later "question[ing] why they were being arrested." <u>Gonzalez v. City of Elgin</u>, 578 F.3d 526, 538 (7th Cir. 2009). In <u>Gonzalez</u>, police officers responded to reports of a fight in a restaurant parking lot. <u>See id.</u> at 530-36. When the officers arrived, the fight had already ended and the people involved in the fight had dispersed, but the officers began forcefully arresting a group of people who remained in the area but had not been involved in the fight. <u>Id.</u> One of the plaintiffs told a police officer, "I think you guys have the wrong people," and followed the officer while the officer was taking another of the plaintiffs into custody. <u>Id.</u> at 531-

32.  The plaintiff told the officer "we didn't do anything" and asked him why he was arresting them and where he was taking her friend. Id. at 532.  A video of the incident showed that this plaintiff followed the officer closely and was "visibly distressed."  Id.  Another plaintiff walked up to the police and "pleaded with them to stop" beating her husband, "saying, 'We didn't do anything. Leave him alone.'"  Id. at 535.  Both of these plaintiffs were arrested for resisting and obstructing an officer, though those charges were later dismissed.  Id. at 532, 535.

In reversing summary judgment against the plaintiffs' false arrest claims, the Seventh Circuit emphasized that "without more evidence, there is nothing wrong in itself with approaching a police officer."  Id. at 538.  The court stated that "'[i]t is well settled under Illinois law . . . that the resistance must be physical; mere argument will not suffice.'"  Id. (quoting Payne v. Pauley, 337 F.3d 767, 776 (7th Cir. 2003)).  Furthermore, the court cited Illinois precedent for the rule that using abusive language against officers does not constitute resisting or obstructing, and that "disrespect for the law, antagonism, or belligerence is insufficient to constitute

resisting or obstructing a peace officer." Id. (citing People v. Long,
738 N.E.2d 216, 222 (Ill. App. Ct. 2000); People v. Flannigan, 267
N.E.2d 739, 741-42 (Ill. App. Ct. 1971)).

Here, Skube's actions are closely analogous to those of the
plaintiffs in Gonzalez, Stoudt, and Weathington. Skube quickly
approached Deputy Koester but stopped several feet away from him
and verbally disputed his actions. In other words, she attempted to
"point out [Deputy Koester's] mistake"—granted, rather passionately
and emotionally, but without the use of any "physical action." See
Crawford, 505 N.E.2d at 396. Under the above cases, Skube was
permitted to approach Deputy Koester and object to what he was
doing and she was allowed to not immediately comply with Deputy
Koester's orders to back up. The Defendants' argument that
Skube's "intention in approaching Deputy Koester was not to have a
discussion with him but was to stop him from searching her purse"
does not affect this analysis. See Defs.' Mot., d/e 107 at 12. The
plaintiffs in Gonzalez surely intended to stop the police officers from
arresting their friends when they approached them and objected to
their actions. What matters is that, in both situations, the

arrestees verbally protested the officers' actions without becoming physically aggressive. Gonzalez made clear that such actions do not violate the resisting/obstructing statute. Therefore, Deputy Koester's first two claimed bases for probable cause—that Skube resisted or obstructed by not standing where she had been told and that she interfered with Deputy Koester's inventory search by approaching him—are both insufficient to establish probable cause under the law.

Consequently, Deputy Koester lacked probable cause to arrest Skube when he first declared that she was under arrest at 12:17 in the video. However, the Court's inquiry does not end there. Even if Deputy Koester did not have probable cause to arrest Skube at the time he declared that she was under arrest, Skube was not permitted to resist Deputy Koester's arrest order. Illinois law mandates that "'resistance of even an unlawful arrest by a known officer' is a violation of the [resisting] statute." City of Champaign v. Torres, 824 N.E.2d 624, 629 (Ill. 2005) (quoting People v. Locken, 322 N.E.2d 51, 54 (Ill. 1974)). Therefore, if Skube's actions after Deputy Koester stated that she was under arrest amounted to

resisting arrest—even though the initial arrest was not valid—
Skube would have violated the statute and given Deputy Koester
probable cause for a valid arrest.  For that reason, the Court must
determine whether Skube's actions from the time that Deputy
Koester declared that Skube was under arrest (12:17 in the video)
to the time that he tased her (12:24 in the video) constituted
resisting arrest.

Determining whether Skube's actions gave rise to probable
cause for her arrest requires the Court to first decide whether
Skube was actively, physically resisting arrest or simply arguing
and being slow to comply with Deputy Koester's orders.  See Abbott,
705 F.3d at 722 ("The greatest difficulty lies in determining the
point at which mere verbal argument or refusal to act becomes an
act of physical resistance or obstruction.").  The precedent in this
area directs that verbal resistance can amount to active, physical
resistance giving rise to probable cause in two situations: (1) if the
arrestee accompanies verbal resistance with some physically
resisting act, and (2) if the arrestee verbally resists and refuses to
comply for a prolonged period of time.

Under the first of these lines of cases, even a brief period of physical resistance can constitute resisting arrest if the resistance is sufficiently active. For instance, in <u>Brooks v. City of Aurora, Illinois</u>, 653 F.3d 478 (7th Cir. 2011), the Seventh Circuit evaluated whether a plaintiff had violated the resisting statute when, having been informed that he was under arrest, the plaintiff "backpedaled away, escaped [the arresting officer]'s attempt to grab his wrist and raised his arms to his shoulders." <u>Id.</u> at 484. A video recorded from the arresting officer's dashboard camera also showed that the plaintiff "repeatedly, physically rebuffed [the arresting officer]'s attempts to grasp him and that, after he had stopped backtracking, [the plaintiff] turned to face [the officer] and threw out his arms in what could be construed as a resisting or defensive posture." <u>Id.</u> The <u>Brooks</u> court found that while this level of resistance may not have actually violated the statute—the state criminal charge for resisting arrest had been dismissed—the question was sufficiently close that the officer was entitled to qualified immunity against the plaintiff's false arrest claim. <u>Id.</u> Other courts have found that an arrestee is resisting if he physically struggles with officers for

several minutes as the officers try to handcuff him, <u>People v.</u>
<u>Ostrowski</u>, 914 N.E.2d 558, 572 (Ill. App. Ct. 2009), or if she runs
towards a police car in what could reasonably be perceived as an
effort to help her son escape from the car and disregards an officer's
orders to stop, <u>Abbott</u>, 705 F.3d at 723.  <u>See also</u> <u>Raby</u>, 240 N.E.2d
at 599 (holding that "physically aiding a third party to avoid arrest"
can constitute resisting or obstructing).  On the other hand, very
minor physical resistance does not constitute resisting arrest.  <u>See</u>
<u>City of Pekin v. Ross</u>, 400 N.E.2d 992, 994 (Ill. App. Ct. 1980)
("[W]hen the officers attempted to handcuff Ross' hands behind his
back he pulled his arms down and in front of him.  Ross testified
that this happened because the officers were hurting him by putting
his hands behind his back and pushing them up.  This certainly
does not constitute resistance.").

Even if an arrestee does not take some active form of physical
resistance, he can violate the statute if he refuses to comply for a
prolonged period of time.  Such was the case in <u>Brickey v.</u>
<u>Fitzgerald</u>, No. 12-3202, 2013 WL 6152302 (C.D. Ill. Nov. 22, 2013),
where this Court held that an officer was entitled to qualified

immunity against a plaintiff's false arrest claim when the plaintiff heatedly argued with the officer and refused to follow the officer's orders for several minutes after the officer declared that the plaintiff was under arrest, requiring two additional officers to come to the scene to assist the arresting officer. Id. at *7; see also People v. Synnott, 811 N.E.2d 236, 237-38, 241 (Ill. App. Ct. 2004) (finding that a man had resisted arrest by refusing officers' repeated orders to exit the man's car, requiring the officers to make numerous attempts to get him out of the car over several minutes).

However, as discussed in detail above, the law is clear—and had been for many years when the events giving rise to this case occurred in July 2011—that a short period of arguing and not complying with police orders does not constitute resisting arrest. See, e.g., Payne, 337 F.3d at 776 ("[T]he resistance must be physical; mere argument will not suffice."); Raby, 240 N.E.2d at 599 (holding that the statute does not "proscribe mere argument with a policeman about the validity of an arrest or other police action"); People v. Berardi, 948 N.E.2d 98, 103-04 (Ill. App. Ct. 2011) (finding that a person had not violated that statute when,

"[a]lthough both parties repeated themselves multiple times, the encounter lasted only a short time. Defendant told Taylor he had a right to be present and Taylor stated that he was not going to debate that question with defendant, and that defendant would be arrested if he did not leave."); <u>McCoy</u>, 881 N.E.2d at 630, 632 (emphasizing that "[t]he statute does not prohibit a person from verbally resisting or arguing with a police officer about the validity of an arrest," and reversing a conviction where the prosecutor had "suggested to the jury that mere argument or refusal to cooperate with a police officer is sufficient to support a finding of guilty").

In this case, Skube argued with Deputy Koester for approximately six seconds after his arrest order before he tased her. She did not physically resist, as her only physical action was to take one step back when Deputy Koester declared that she was under arrest, in what appeared to be a surprised reaction to Deputy Koester's arrest order, while asking him, "How am I under arrest?" Vid. at 12:19-12:20. Skube then continued to object that Deputy Koester did not have the right to search her purse. Vid. at 12:22-12:23. She did not "backpeddle away" or "repeatedly, physically

rebuff[] [Deputy Koester]'s attempts to grasp [her]," as the plaintiff in <u>Brooks</u> did. <u>See</u> <u>Brooks</u>, 653 F.3d at 484. Furthermore, her period of argument was not nearly as prolonged as the plaintiffs' resistance in <u>Brickey</u> and <u>Synnott</u>. Rather, Skube verbally resisted and argued for a period of several seconds and she was not given an opportunity for "eventual cooperation" before Deputy Koester tased her. <u>See</u> <u>Weathington</u>, 411 N.E.2d at 864. The law was clear that this brief period of argument did not constitute resisting arrest, so Deputy Koester had neither probable cause nor arguable probable cause to arrest Skube when he did so.

For these reasons, under the clearly established law that existed at the time of Skube's arrest, no reasonable officer in Deputy Koester's position would have believed that he had probable cause to arrest Skube for resisting or obstructing a peace officer. Therefore, a jury could find that Deputy Koester falsely arrested Skube, meaning that Deputy Koester is not entitled to summary judgment or a finding of qualified immunity on Skube's false arrest claim against Koester in his individual capacity.

### C. Deputy Koester is not entitled to summary judgment or

**qualified immunity against Skube's excessive force claim.**

Deputy Koester also moves for summary judgment and a finding of qualified immunity against Skube's excessive force claim related to the first use of his taser.  The Court's previous finding regarding Skube's false arrest claim has important ramifications for her excessive force claims.  The Seventh Circuit has held that "when an illegal arrest sets off a chain of indignities inflicted on the hapless victim, including offensive physical touchings that would be privileged if the arrest were lawful, she is entitled to obtain damages for these indignities whether or not they are independent violations of the Constitution."  Herzog v. Vill. of Winnetka, Ill., 309 F.3d 1041, 1044 (7th Cir. 2002); see also Williams v. Sirmons, 307 F. App'x 354, 360 (11th Cir. 2009) ("If no probable cause authorizes an arrest, *any* use of force to effectuate the unlawful arrest is a violation of the Fourth Amendment.").  Therefore, if a jury finds that Deputy Koester's arrest of Skube was unlawful, Deputy Koester's use of force in effectuating that arrest would be per se unreasonable.  Because the Court today holds that a jury could

make such a finding about the arrest, making Deputy Koester liable for excessive use of force against Skube, the Court cannot grant summary judgment on Skube's claim or find that Deputy Koester is entitled to qualified immunity.

Furthermore, even if a jury were to find against Skube on her false arrest claim, Deputy Koester would still not be entitled to summary judgment or qualified immunity against Skube's excessive force claim. Regarding excessive force, the Seventh Circuit has held that "[e]ven when a police officer has probable cause to execute an arrest, he still may have committed [a constitutional violation] 'if, judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest.'" Brooks, 653 F.3d at 486 (quoting Gonzalez, 578 F.3d at 539).

To determine whether Deputy Koester's use of force was reasonable, the Court must examine Deputy Koester's actions under the three-factor test laid out by the Supreme Court in Graham v. Connor, 490 U.S. 386, 396 (1989). These factors include (1) "the severity of the crime at issue," (2) "whether the

suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [s]he is actively resisting arrest or attempting to evade arrest by flight." Id. In evaluating an officer's actions, the "use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. The ultimate question "is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." Id. at 397. Because the determination is an objective one, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id.

Here, the Graham factors did not support any significant use of force against Skube. First, even if Deputy Koester had been correct that there was probable cause to believe that Skube had committed an offense, Skube's offense was minor—the nonviolent resistance of an unlawful arrest order. See Abbott, 705 F.3d at 730 (stating that obstructing or resisting a police officer is "not a serious or violent crime"). Furthermore, while Deputy Koester testified that

he viewed Skube as a threat to him and Officer Leggitt, <u>see</u> Deputy Koester Dep., d/e 107-1 at 294, 327, that testimony is inconsistent with the video evidence and with his own statements in his deposition.  The Court notes that, to the extent that Deputy Koester's testimony about Skube constituting a threat conflicts with what is depicted in the video, the Court is permitted to "view[] the facts in the light depicted by the videotape."  <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 381 (2007) (instructing lower courts not to consider testimony that "is so utterly discredited by the record that no reasonable jury could have believed [it]").  The Court concludes that Deputy Koester's testimony that Skube was "go[ing] back and forth" from a "fight stance" is inconsistent with what is depicted in the video.  <u>See</u> Deputy Koester Dep., d/e 107-1 at 294-96.  The only movements Skube made were to gesture with her hands when she was objecting to Deputy Koester's search and, after Deputy Koester told her she was under arrest, to take one step backwards and bend her arms out at her elbows, with her palms facing out in a questioning gesture.  Vid. 12:11-12:20.  Immediately before Deputy Koester tased her, she again gestured at the car while stepping

back with her right foot and repeating that Deputy Koester did not have the right to search her purse. Vid. 12:21-12:23. None of these actions appear threatening. Further, Deputy Koester had already conducted an "ocular pat-down" of Skube by looking her over for weapons when she first got out of the SUV and concluded that she did not have a weapon. See Deputy Koester Dep., d/e 107-1 at 305. And any possible threat that Flagg could have posed was essentially neutralized, as he was secured in Deputy Koester's squad car and Officer Leggitt was monitoring him. The Court concludes that "[t]his was simply not the kind of 'tense, uncertain, and rapidly evolving' situation that required 'split-second' judgment calls." See Phillips, 678 F.3d at 526 (quoting Graham, 490 U.S. at 397). The situation here—standing on the side of the road with an uncooperative arrestee—may have presented some danger, but "'[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury.'" Abbott, 705 F.3d at 731 (quoting Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir. 2001)). Moreover, Skube was not "actively resisting arrest"—as the Court

discussed in the previous section, Skube's resistance cannot be considered active. She may have become "verbally belligerent," but verbal belligerence does not constitute active resistance. See Gonzalez, 578 F.3d at 539.

The Seventh Circuit has held that, in situations such as this one, where a nonviolent, minor offender is not actively resisting arrest, the arresting officer may use only minimal force. See Abbott, 705 F.3d at 732 (stating that "only a minimal amount of force may be used on" nonresisting or passively resisting arrestees); Smith v. Ball State Univ., 295 F.3d 763, 771 (7th Cir. 2003) (holding that an arrestee's unresponsiveness to police inquiries, which officers could "reasonably misconstrue . . . as resistance," required "the minimal use of force"). The use of a taser in dart mode, however, does not constitute minimal force. Lewis v. Downey, 581 F.3d 467, 475 (7th Cir. 2009) (holding that "the use of a taser gun . . . is more than a de minimis application of force"). For that reason, "courts generally hold that it is unreasonable for officers to deploy a taser against a misdemeanant who is not actively resisting arrest." Abbott, 705 F.3d at 730.

In <u>Abbott</u>, an officer arrested a young man, Travis, for obstructing a peace officer after Travis interfered with animal control officers' efforts to secure his loose dog. 705 F.3d at 710. The arresting officer placed Travis in the back of a squad car, where Travis struggled with the officer to get free. <u>Id.</u> After the officer had secured Travis in the car, Travis's mother, Cindy, began moving toward the car while yelling at the officer. <u>Id.</u> at 710-11. The officer ordered Cindy to stop, and when she disregarded his orders and kept moving towards the car, the officer fired his taser at her. <u>Id.</u> at 711. Cindy fell to the ground, and the officer activated the taser a second time. <u>Id.</u> The plaintiffs—Cindy and Travis—did not challenge the officer's first use of the taser against Cindy, but the court concluded that a jury could find that the second use of the taser was unreasonable. <u>Id.</u> at 729-30.

Regarding the defendants' arguments about the "rapidly unfolding" nature of the events leading up to the tasing, the Seventh Circuit in <u>Abbott</u> court emphasized that:

> We are mindful that Deputy Sweeney acted in a rapidly unfolding situation and that officers are to be given leeway under those circumstances. But Sweeney

attempts to transform the circumstances into much more than they really were. Although he reasonably believed that Travis was attempting to escape, it is undisputed that Travis could not open the car door from the inside. And had he escaped, it is unlikely he would have gone far because Sergeant Lawley or the animal control officers could have intercepted him—this is not the case of a single officer attempting to control and detain multiple suspects. Furthermore, Travis was not a violent criminal who had been arrested for a violent crime; rather, he simply had been acting foolishly, albeit criminally. Because the <u>Graham</u> balance tips so heavily in Cindy's favor, we do not think that the rapidly unfolding nature of these relatively innocuous events tips the balance the other way.

<u>Id.</u> at 731. Furthermore, in denying the officer qualified immunity, the court held that, "[p]rior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects." <u>Id.</u> at 732.

Similarly, in <u>Cyrus v. Town of Mukwonago</u>, 624 F.3d 856, 863 (7th Cir. 2010), the Seventh Circuit held that repeated tasings could be found unreasonable where the plaintiff "had, at most, committed a misdemeanor offense . . . and he was not exhibiting violent behavior." <u>Id.</u> The <u>Cyrus</u> court also noted that, "As importantly, there is no evidence suggesting that [the plaintiff] violently resisted the officers' attempts to handcuff him." <u>Id.</u>; <u>see also</u> <u>Phillips</u>, 678

F.3d at 524-25 (finding that minimal force was required against an arrestee who "never exhibited any sort of aggressive behavior toward the officers" and did not attempt to escape, but instead exhibited "passive noncompliance" with officers' orders to exit her vehicle).

Other circuits have also emphasized that the use of a taser against a nonviolent, minor offender is excessive. See Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 509-10 (6th Cir. 2012) (recognizing that "[a] suspect's active resistance . . . marks the line between reasonable and unreasonable tasing in" the Sixth, Eighth, Tenth, and Eleventh Circuits); Bryan v. MacPherson, 630 F.3d 805, 828-29 (9th Cir. 2010) ("While the commission of a misdemeanor offense is not to be taken lightly, it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers or others.") (internal quotation marks omitted); Brown v. City of Golden Valley, 574 F.3d 491, 499 (8th Cir. 2009) ("[T]he law was sufficiently clear to inform a reasonable officer that it was unlawful to [t]aser a nonviolent, suspected misdemeanant who was not

fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator."); Parker v. Gerrish, 547 F.3d 1, 9-10 (1st Cir. 2008) (holding that a jury could reasonably find excessive an officer's use of a taser against an arrestee who was at most passively resisting arrest); Casey v. City of Fed. Heights, 509 F.3d 1278, 1281-82 (10th Cir. 2007) (concluding that the use of a taser against a nonviolent misdemeanant was excessive).

Further, the case sub judice is distinguishable from those in the Seventh Circuit where the court has found the use of a taser to be reasonable. See, e.g., Clarett v. Roberts, 657 F.3d 664, 674-75 (7th Cir. 2011) (holding that the use of a taser was reasonable where the jury could have found that the plaintiff was blocking officers from entering a room in which the officers reasonably believed that other officers needed help, and finding that the subsequent use of the taser was reasonable because the plaintiff "was kicking and flailing at [the arresting officer] and continued this assaultive behavior when he tried to arrest her"); United States v.

<u>Norris</u>, 640 F.3d 295, 303 (7th Cir. 2011) (concluding that it was reasonable to use a taser on a defendant when he had "displayed an unwillingness to accede to reasonable police commands, and his actions suggested an intent to use violence to fend off further police action"); <u>Forrest v. Prine</u>, 620 F.3d 739, 745 (7th Cir. 2010) (ruling against a plaintiff's excessive force claim where the plaintiff was not merely "slow to comply with an order," but rather "had attacked an officer earlier in the night," "was a relatively large man confined in an enclosed space of relatively small area," and "was pacing in [his] cell, clenching his fists and yelling obscenities" while disregarding the tasing officer's repeated orders over the course of several minutes).

The above cases, along with the cases discussed in the previous section, negate the Defendants' assertion that "[t]here is no closely analogous case law that would put Deputy Koester on notice that Plaintiff's actions were passive and that use of a Taser was unreasonable." <u>See</u> Defs.' Mot., d/e 107 at 18. The law was clear at the time that Deputy Koester tased Skube that Skube's actions did not amount to active resistance and that the use of a taser in

dart mode against a nonviolent, minor offender was unreasonable.

Deputy Koester is therefore not entitled to summary judgment or a

finding of qualified immunity against Skube's excessive force claim.

**D. Pursuant to Federal Rule of Civil Procedure 56(f), the Court is considering granting summary judgment in favor of Skube on her excessive force and false arrest claims against Deputy Koester in his individual capacity.**

Given the above legal conclusions, the Court is considering

granting summary judgment in favor of Skube on her false arrest

and excessive force claims against Deputy Koester in his individual

capacity. The factual questions at issue in these claims appear to

be resolved by the video. Therefore, the Court does not have to

construe facts in favor of the Plaintiff to decide that no reasonable

officer would have thought he had probable cause to arrest Skube

or felt that he needed to use a taser against her in dart mode.

Instead, the Court can make objective determinations regarding the

existence of probable cause for Skube's arrest and the

reasonableness of Deputy Koester's use of force.

A jury may be able to find that Deputy Koester genuinely

believed that Skube was obstructing his inventory search or

resisting arrest, but such a finding would not change the fact that Skube's actions—several seconds of arguing with Deputy Koester about why he was searching her purse and the grounds for declaring that she was under arrest—are exactly the sorts of actions that Raby and its progeny held do not violate the resisting arrest statute.  There are, therefore, no factual questions for a jury to resolve here; the Court is simply making a legal determination that, given the state of the law in July 2011, no reasonable officer would have believed that he had probable cause to arrest Skube for resisting arrest.  See Abbott, 705 F.3d at 714 ("Usually in a § 1983 false-arrest case the jury determines whether the arrest was supported by probable cause; but if the underlying facts are undisputed, the court can make that decision on summary judgment.").  The same is true of Skube's excessive force claim, in that, a jury could find that Deputy Koester genuinely believed that he needed to tase Skube, but that finding would be legally irrelevant.  The inquiry is one of objective reasonableness, Graham, 490 U.S. at 397, and, as described earlier, the video makes clear that Deputy Koester's belief that he needed to tase Skube was

objectively unreasonable.[2]  See Phillips, 678 F.3d at 520 ("Objective

reasonableness of force is a legal determination rather than a pure

question of fact for the jury to decide.").  Additionally, Deputy

Koester cannot create a question of material fact by contradicting

what the video plainly shows, as the Court will "view[] the facts in

the light depicted by the videotape."  See Scott, 550 U.S. at 380-81.

Therefore, the Court is hereby giving notice pursuant to

Federal Rule of Civil Procedure 56(f) that the Court is considering

granting summary judgment on behalf of Skube on Counts VIII, II,

and IV of her Second Amended Complaint.

### E. Deputy Koester is entitled to summary judgment on Skube's improper search and seizure claim.

Both Skube and the Defendants move for summary judgment

on Skube's improper search and seizure claim against Deputy

Koester in his individual capacity.  Deputy Koester argues that he

was entitled to search Skube's purse as part of a lawful inventory

search.  See Defs.' Mot., d/e 107 at 23-26.  Skube counters that

---

[2] Again, this inquiry is only relevant if the Court finds against the Plaintiff on her unlawful arrest claim.  If the Court finds that the arrest was unlawful, then the force Deputy Koester used in effecting that arrest was excessive.  See Herzog, 309 F.3d at 1044.

Deputy Koester's inventory search should not have extended to Skube's purse, and that Deputy Koester actually used his inventory search as a pretext for "rummaging" through the purse.  <u>See</u> Memorandum in Support of Plaintiff's Partial Motion for Summary Judgment, d/e 108-1 at 5-7.

In general, "[i]nventory searches constitute a well-recognized exception to the warrant requirement and are reasonable under the Fourth Amendment."  <u>United States v. Cartwright</u>, 630 F.3d 610, 613 (7th Cir. 2010) (citing <u>South Dakota v. Opperman</u>, 428 U.S. 364, 376, (1976)).  An officer can conduct an inventory search if the search is "conducted pursuant to standard police procedures aimed at protecting the owner's property—and protecting the police from the owner's charging them with having stolen, lost, or damaged his property."  <u>United States v. Pittman</u>, 411 F.3d 813, 817 (7th Cir. 2005).  In addition to protecting property, inventory searches serve to protect officers from potential danger.  <u>Opperman</u>, 428 U.S. at 376.  The purpose of requiring police departments to follow standard inventory procedures is to ensure that a department's inventory searches are "designed to produce an inventory," rather

than being used as "a ruse for a general rummaging in order to discover incriminating evidence." See Florida v. Wells, 495 U.S. 1, 4 (1990); Cartwright, 630 F.3d at 614 (emphasizing that "[t]he existence of a police policy, city ordinance, or state law alone does not render a particular search or seizure reasonable or otherwise immune from scrutiny under the Fourth Amendment," and examining the inventory policy in question to ensure that it was designed to meet the legitimate purposes of an inventory search); United States v. Lomeli, 76 F.3d 146, 148 (7th Cir. 1996) ("Requiring sufficient regulation of inventory searches ensures that a police procedure is not merely a pretext for concealing an investigatory police motive.").

Here, Deputy Koester was operating pursuant to a standard policy when he ordered Flagg's car to be towed and then began conducting an inventory search. The Sangamon County Sheriff's Office Tow and Inventory Policy permits a car to be towed after its driver is arrested for DUI. See Sangamon County Sheriff's Office Tow and Inventory Policy, d/e 107-3 at 1. The policy also grants an officer the discretion to allow another licensed driver to take control

of a vehicle instead of having it towed.  Id.  When an officer orders a

vehicle to be towed, he may conduct an inventory search under the

following procedure:

> An examination and inventory of the contents of all
> vehicles towed, removed or held by [Sangamon County
> Sheriff's Office] shall be conducted.  The examination and
> inventory will be restricted to those areas where an owner
> or operator would ordinarily place or store property or
> equipment in a vehicle.  This would normally include the
> front and rear seat area, glove compartment, map case,
> sun visor, console storage compartment, trunk,
> receptacles, luggage, boxes, bags, engine compartment,
> or any area of the vehicle which might contain the
> owner's or operator's property or equipment, including
> any open, closed or locked containers therein.

Sangamon County Sheriff's Office Tow and Inventory Policy, d/e

107-3 at 2.

Here, because Deputy Koester arrested Flagg for DUI, he was

permitted to order Flagg's car to be towed.  Deputy Koester testified

that he judged Skube to be intoxicated, so he did not think she

should drive Flagg's car.  See Deputy Koester Dep., d/e 107-1 at

244-45.  Once Deputy Koester ordered Flagg's car towed, the

Sangamon County policy authorized him to search the car.  See

Pittman, 411 F.3d at 817.  The Court concludes that Sangamon

County's inventory policy is directed at inventorying and protecting the property of the owners of towed vehicles and does not appear to be designed as a "ruse" to permit "general rummaging." See Wells, 495 U.S. at 4. Therefore, the policy provided Deputy Koester valid authorization for his inventory search of Flagg's car.

Skube argues that, even if an inventory search were permitted, the otherwise valid search should not have encompassed her purse. Skube further alleges that Deputy Koester knew that the purse belonged to Skube, not Flagg, and, therefore, Deputy Koester should not have searched it. See Pl.'s Mem., d/e 108-1 at 5-6. As a matter of common sense, the Court agrees. The purple Coach purse sitting on Skube's seat quite clearly belonged to Skube, not Flagg. See Skube Dep., d/e 107-6 at 40-41; Koester Dep., d/e 107-1 at 244. It would have been logical for Deputy Koester to ask Skube to take her purse, rather than inventorying it with Skube standing a few feet away from him.

Regardless, the Court concludes that Deputy Koester was not legally required to ask Skube about the purse before he conducted his inventory search. Deputy Koester was permitted to conduct an

inventory search of Flagg's vehicle, and the inventory policy he

followed reasonably encompassed property left on the passenger's

seat.  Therefore, Deputy Koester was permitted to search the purse

as part of his inventory.  Similarly, in United States v. Battle, 370 F.

App'x 426 (4th Cir. 2010), the Fourth Circuit upheld a conviction

based upon an inventory search that encompassed the property of a

passenger who had not been arrested, even though the officer who

conducted the search had not asked the passenger to retrieve his

belongings before beginning the search.  Id. at 429.  The court

found that:

> The specific language of the policy does not require an
> officer to allow the passengers to retrieve their valuables
> before the inventory search.  Manifestly, allowing a
> motorist to retrieve containers before the completion of
> an inventory search would defeat one of the purposes of
> the search: the protection of an officer.

Id.  Here, the Sangamon County Tow and Inventory Policy did not

require officers to ask occupants of a vehicle that was going to be

towed to remove their belongings before conducting an inventory

search.  Therefore, Deputy Koester was allowed to follow this valid

inventory policy and begin his inventory with the property left on

the passenger's seat of Flagg's vehicle.

Skube does not squarely address this issue. She does not cite any cases holding that an officer must ask a passenger to remove her property from a vehicle before conducting an inventory search. Instead, Skube emphasizes that the Opperman court stated that the purpose of an inventory search is "the protection of the *owner's property* while it remains in police custody." Opperman, 428 U.S. at 369 (emphasis added). Subsequent courts, when citing Opperman and its progeny, also specifically mention protection of the "owner's property." See, e.g., Pittman, 411 F.3d at 817; United States v. Richardson, 121 F.3d 1051, 1055 (7th Cir. 1997). However, none of these courts used "owner" as a term to distinguish the owner of the car from any hypothetical passengers, rather than as a general term for the occupant of the vehicle. See Opperman, 428 U.S. at 365-66 (the "owner" whose property was confiscated after the inventory search had also been the only occupant of the vehicle); Richardson, 121 F.3d at 1051 (same). These courts were also not necessarily referring to the owner of the car, as opposed to the owner of the inventoried property.

Further, the way in which courts analyze inventory searches belies any argument that officers are only permitted to search the property of arrestees. In <u>Cartwright</u>, the driver of a car was arrested for driving without a license, but the owner of the car was actually the passenger. <u>See</u> <u>Cartwright</u>, 630 F.3d at 612. After arresting the driver, the police conducted a search of the car in preparation for towing it, without first asking the passenger/owner to remove any of her belongings from the car. <u>Id.</u> at 612-13. Even though the court stated that "[a]n inventory search is lawful if . . . the individual whose possession is to be searched has been lawfully arrested," the court did not find problematic the police's search of the passenger/owner's property, who had not been arrested. <u>Id.</u> at 614. Therefore, the <u>Cartwright</u> court appears to hold that an inventory search is lawful if the driver of the vehicle is lawfully arrested.

Skube argues that, even if an inventory search could encompass her purse, "[i]t is clear by his actions that Deputy Koester searched the purse, not for purposes of an inventory, but as a 'pretext for concealing some other kind of investigatory search.'"

Pl.'s Mem., d/e 108-1 at 6.[3]  However, because Deputy Koester was

permitted to search the purse as part of his inventory search, any

investigatory motive that he possessed is irrelevant.  See Lomeli, 76

F.3d at 148 ("[T]he fact that an inventory search may also have had

an investigatory motive does not invalidate it.").  Since Deputy

Koester's search of Skube's purse did not constitute an improper

search, Skube's motion for partial summary judgment is denied,

and the Defendants' motion for summary judgment on this cause is

granted.  As the Court is granting summary judgment on Skube's

improper search and seizure claim, the Court need not reach the

question of whether Skube would be entitled to compensatory

damages on this claim.

**F. Deputy Koester is not entitled to summary judgment on Skube's assault and battery claim.**

Lastly, Deputy Koester moves for summary judgment on

Skube's state law claim for assault and battery, but only as to

Deputy Koester's first use of the taser against Skube.  To establish

an assault and battery under Illinois law, a plaintiff must show that

---

[3]  The Plaintiff attributes this quote to "Opperman, 428 at 376," but Opperman actually refers to "a pretext concealing an investigatory police motive." Opperman, 428 U.S. at 376.

a defendant "act[ed] intending to cause a harmful or offensive contact" with the plaintiff, and "a harmful contact with the [plaintiff] directly or indirectly result[ed]." <u>Flores v. Santiago</u>, 986 N.E.2d 1216, 1219 (Ill. App. Ct. 2013) (internal quotation marks and citations omitted).

As a public officer, Deputy Koester's actions are insulated from state tort claims by the Illinois Tort Immunity Act, which states that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. For an act to be considered "willful or wanton," the act "must have been committed with an actual or deliberate intention to cause harm" or with "an utter indifference to or conscious disregard for the safety of others." 745 ILCS 10/1-210; <u>Nelson v. Thomas</u>, 668 N.E.2d 1109, 1116-17 (Ill. App. Ct. 1996).

As explained earlier, the use of a taser in dart mode constitutes an intermediate level of force that causes "intense pain." <u>See</u> <u>Abbott</u>, 705 F.3d at 726; <u>Lewis</u>, 581 F.3d at 475. Given that a jury could find that Deputy Koester unlawfully arrested Skube and

used excessive force in effecting that arrest, a jury could also find that Deputy Koester acted with an "utter indifference to or conscious disregard for" Skube's safety when he tased her. Therefore, summary judgment on Skube's assault and battery claim is denied.

## IV.  CONCLUSION

For those reasons, the Defendants' Motion for Summary Judgment is GRANTED as to Skube's false arrest claim against Deputy Koester in his official capacity (Count VII) and her improper search and seizure claim against Deputy Koester in his individual capacity (Count VI), and DENIED as to Skube's false arrest and excessive force claims against Deputy Koester in his individual capacity (Counts VIII and II) and her assault and battery claim against Deputy Koester in his official capacity (Count XIII). Additionally, the Plaintiff's Partial Motion for Summary Judgment is DENIED.  Because there are no surviving claims against Sheriff Williamson or the Sangamon County Sheriff's Office, those Defendants are DISMISSED from this suit.  Sangamon County will remain in this suit only as an indemnity party under Count XVI of

the Plaintiff's complaint.

The Court hereby issues notice under Federal Rule of Civil Procedure 56(f) that the Court is considering granting summary judgment in favor of the Plaintiff on her false arrest and excessive force claims against Deputy Koester in his individual capacity (Counts VIII, II, and IV). The Defendants may file a brief arguing why the Court should not grant summary judgment in favor of the Plaintiff on these claims by March 6, 2015. The Plaintiff may respond to that brief by March 13, 2015.

ENTER: February 27, 2015.

s/ Sue E. Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE